TIMOTHY S. LEIMAN, Ill. Bar No. 6270153
Email: leimant@sec.gov
JAKE SCHMIDT, Ill. Bar No. 6270569
Email: schmidtj@sec.gov
TARYN E. LEWIS, Ill. Bar No. 6322661
Email: lewistar@sec.gov

Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398

LOCAL COUNSEL
Gary Y. Leung Cal. Bar No. 302928
Email: leungg@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ANDREW WYLES WATERS, <br><br> Defendant, and <br><br> HELEN Q. WATERS, <br><br> Relief Defendant. | Case No. 2:23-CV-06799 <br><br> **COMPLAINT** |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

## JURISDICTION AND VENUE

1.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

2.      This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

3.      Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act (15 U.S.C. § 78aa). Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere. Moreover, Defendant Andrew Waters and Relief Defendant Helen Waters resided or transacted business in this district – specifically, Montecito, California – during a portion of the time of the alleged misconduct. Venue also is appropriate pursuant to 28 U.S.C. § 1391.  A substantial part of the events or omissions giving rise to the claims occurred within this district.  [28 U.S.C. § 1391(b)(2).]

4.      In addition, on information and belief, Defendant and Relief Defendant are not currently resident in the United States and, therefore, may be sued in any judicial district in the United States.  [28 U.S.C. § 1391(c)(3).]

5.      Defendant, directly and indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the alleged acts, practices, and courses of business.

## SUMMARY

6.    This matter concerns a fraudulent scheme perpetrated by Defendant Andrew Wyles Waters ("Waters") involving his private sale of restricted common stock in ECom Products Group Corporation ("EPGC") (OTC: EPGC), a Florida corporation that purportedly owns, consolidates, and manages e-commerce platforms.

7.    From late 2019 to July 2022, Waters fraudulently induced more than 20 investors to purchase EPGC common stock from him, and fraudulently caused 12 investors to accept EPGC common stock in exchange for the stock of another company he owned and controlled. The EPGC common stock that Waters sold to investors (both in direct sales and the exchange of shares) had a total face value of approximately $3 million.

8.    Waters' fraud was relatively simple. <u>First</u>, Waters gained control of EPGC by taking over its Board of Directors, and acquiring a majority of its stock in exchange for purported valuable Chinese "free zone trading licenses," and false promises of a total of $2 million in cash infusions.

9.    <u>Second</u>, Waters caused investors in another company he owned and controlled to accept some of his EPGC common stock in exchange for the stock of his other company. He falsely represented that the share exchange was beneficial to investors by touting supposedly valuable assets held by EPGC, including a lucrative partnership with an affiliate of a well-known fashion magazine and the valuable "free zone trading licenses" which purportedly allowed EPGC to save on Chinese import taxes.

10.    <u>Third</u>, Waters targeted wealthy individuals in the Montecito, California and Aspen, Colorado areas to buy his EPGC stock by pitching to them a purportedly profitable investment "opportunity." Waters falsely told investors that – because of an "imminent" securities offering by EPGC under Regulation A of the Securities Act – investors could buy company shares from him at a discounted rate of  $0.212 per share and resell them quickly to ready and willing buyers for $.75 to $1.00 per share

(a near-instant 300% to 400% profit). In reality, this investment "opportunity" was a scam. The purported securities offering was far from imminent, Waters had not taken the steps necessary to get the offering off the ground, and Waters had not lined up buyers to purchase investor shares. Ultimately, the promised EPGC Regulation A offering did not take place.

11.     Fourth, to further entice investors into handing over their money, Waters made repeated false and misleading statements to investors about EPGC's business, as well as his intended use of the funds he obtained from his sales of the stock. Among other things, Waters (a) touted supposedly valuable assets held by the company, including the partnership with an affiliate of a well-known fashion magazine, the valuable Chinese "free zone trading licenses," and a "proprietary database" of "high-end consumers," (b) boasted that EPGC had between $800,000 and $2.4 million in recurring annual revenue, and (c) told investors that the proceeds from their stock purchases would be used to fund EPGC.

12.     Waters' representations to investors were lies. In reality, (a) the partnership, consumer database, and Chinese trading licenses were worthless (to the extent they even existed), and (b) EPGC had nowhere near the revenue that Waters claimed (with EPGC's actual revenue declining from $68,936 in 2020 to $0 in 2022).

13.     Finally, even though he promised investors that funds from the stock sales would be used for EPGC's benefit, Waters funneled at least $1.3 million in investor funds to himself and his wife, Relief Defendant Helen Q. Waters ("Helen"), through shell company accounts they owned and controlled. Waters and Helen then used cash proceeds from Waters' fraud for personal expenses – including expenses associated with horseback riding (horses, boarding fees, and riding lessons) and long-term luxury home rentals. Such expenditures enabled Waters and his wife to maintain their lavish lifestyle and thereby make contact with the next round of victims in and around Montecito, California and Aspen, Colorado. Meanwhile, investors were left holding stock that was virtually worthless.

14.     By engaging in the conduct described in this Complaint, Defendant Waters has engaged and – if not enjoined – will continue to engage in transactions, acts and practices, and courses of business that violate the antifraud provisions of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## DEFENDANTS

15.     **Andrew Wyles Waters ("Waters")**, age 59, is an Australian citizen who, until approximately November 2022, was a resident of the United States. Until approximately January 2021, Andrew Waters resided in Montecito, California. He then moved to Colorado until November 2022. On information and belief, Waters now resides in Bali, Indonesia. Waters joined EPGC as its Executive Chairman in 2016 and, upon information and belief, has controlled EPGC since 2017. As of December 2022, Waters served as EPGC's Director and CEO, and owned nearly 55% of EPGC's outstanding shares via two other entities he owns and controls: Co Brand Partners USA, Inc. ("CBP USA") and FCP Investments, Ltd. ("FCP").

## RELIEF DEFENDANT

16.     **Helen Q. Waters ("Helen")**, age 47, is an Australian citizen who, until approximately November 2022, was a resident of Basalt, Colorado. Helen is married to Andrew Waters. On information and belief, Helen Waters has left the United States with Andrew Waters and currently resides in Bali, Indonesia.

## RELATED ENTITIES

17.     **ECom Products Group Corporation ("EPGC")** is a Florida corporation with a registered address in Tampa, Florida, which purportedly operates virtually and has no physical address. EPGC was incorporated in 2010 under the name Discount Coupons Corporation ("DCOU") and changed its name in November 2016 to EPGC. Since January 2017, EPGC has traded on the over-the-counter ("OTC") market through OTC Link (whose parent company is OTC Markets Group,

Inc.) under the ticker symbol "EPGC." EPGC has only two employees: Waters and Waters' long-time associate, who serves as EPGC's Director and Corporate Secretary and is based in London, England.

18. **Co Brand Partners, Limited ("CBP Ltd.")** was a Hong Kong-registered company majority-owned and controlled by Waters. Waters wound up CBP Ltd.'s operations in late 2019. In connection with this wind-up, CBP Ltd. distributed to its shareholders a special dividend consisting of EPGC shares.

19. **Co Brand Partners USA, Inc. ("CBP USA")** is a Delaware corporation that was incorporated in September 2018. CBP USA, which is owned and controlled by Waters, holds nearly 22% of outstanding EPGC shares. CBP USA does not have *bona fide* business operations. Upon information and belief, it has no employees, business activities, revenue, or assets, other than Waters' EPGC stock. CBP USA operates as Waters' alter ego. It exists only to hold and transfer assets on Waters' behalf.

20. **FCP Investments, Ltd. ("FCP")** is a Hong Kong company owned and controlled by Waters. FCP holds 33% of outstanding EPGC shares. FCP does not have *bona fide* business operations. Upon information and belief, it has no employees, business activities, revenue, or assets, other than Waters' EPGC stock. FCP operates as Waters' alter ego and exists only to hold and transfer assets on Waters' behalf.

## **FACTS**

### **Background of EPGC and Waters' Fraud:**

21. Waters' fraudulent scheme began with his takeover of EPGC – a company that purportedly operated as an internet marketing and technology company that owned and managed consumer sales websites and provided digital marketing services.

22. Waters joined EPGC as its Executive Chairman in December 2016.

23.     At the time Waters joined EPGC, the company already was in dire financial condition. As of year-end 2016, EPGC had (a) net losses of over $500,000 in the previous year, (b) over $1 million in outstanding liabilities, (c) minimal revenue from operations, and (d) less than $5,000 of cash on hand.

24.     Shortly after joining EPGC in 2016, Waters took control of the EPGC Board and acquired a majority of outstanding EPGC shares.

25.     Waters acquired a majority interest in EPGC by causing EPGC to issue restricted EPGC shares to shell companies Waters owned and controlled (including CBP Ltd. and FCP). Waters obtained the stock: (i) as consideration for his sale to EPGC of certain purportedly valuable assets, including Chinese import/export and trading licenses that he claimed would allow EPGC customers to save on Chinese import taxes; and (ii) as advances for $2 million that Waters promised to invest in the company.

26.     As discussed in ¶¶ 63-67 below, the purported Chinese import/export and trading licenses have not generated any revenue for EPGC and the value of the purported licenses was subsequently written off EPGC's books (*i.e.*, valued at $0). In addition, Waters has not made the promised $2 million in cash infusions to EPGC.

27.     Despite failing to live up to the conditions of the share transfers, from February 9, 2017 to December 4, 2019, Waters acquired over 59.6 million shares of EPGC restricted stock through companies that he owned and controlled.

28.     Waters admitted to another EPGC Director he invested in EPGC because it was a publicly-traded shell with which Waters could "do what he wanted."

29.     As of December 31, 2022, Waters was serving as EPGC's Director and CEO, and held nearly 55% of EPGC's outstanding shares via CBP USA and FCP.

30.     Nearly all of EPGC's outstanding shares are restricted, and the non-restricted shares are very thinly traded.

31.     At all times relevant to this Complaint, EPGC shares have qualified as a "penny stock" within the meaning of Section 3(a)(51) of the Exchange Act and Rule

3a51-1 thereunder: (a) EPGC shares have not traded above $5 per share, (b) its net tangible assets have not exceeded $2 million, and (c) its revenues have not exceeded $6 million.

**Waters Raises Money From Investors**:

32.    EPGC did not make any financial information available to the public between March 2017 and September 2021. It was largely during the absence of such publicly-available financial information that Waters persuaded investors to purchase – or caused them to accept in lieu of repayment – approximately $3 million of his restricted EPGC stock.

33.    Between 2018 and 2022 – as Waters and his wife moved from residence to residence – Waters found victims for his fraud wherever he lived.

34.    Beginning in or around 2018, while Waters was living in Asia, he raised approximately $1.4 million in investments in CBP Ltd. (majority-owned and controlled by Waters) from non-U.S. investors, primarily individuals living in Australia.

35.    The CBP Ltd. investors were ultimately roped into Waters' EPGC scheme when Waters compelled them to swap their CBP Ltd. shares for shares of EPGC.

36.    In December 2019, after moving to the United States, Waters – who was CBP Ltd.'s sole voting shareholder – passed a resolution to cease CBP Ltd.'s purported business operations and to pay to CBP Ltd. shareholders a "special dividend" consisting of EPGC shares in connection with CBP Ltd.'s wind-up.

37.    In March 2020, CBP Ltd. investors received EPGC stock with a purported value over $1.5 million (*i.e.*, in excess of their initial investment amount).

38.    Although he did not offer investors a choice as to whether to accept EPGC stock or other consideration in exchange for their CBP Ltd. shares, Waters sought to convince investors that the share exchange was beneficial to investors by making similar misrepresentations to those he later made to U.S.-based EPGC stock

purchasers about ELLEShop and EPGC's purported Chinese trading license (detailed in ¶¶ 50-67 below).

39.     After moving from Asia to the United States, Waters continued his fraudulent scheme with a new set of victims.

40.     During his residency in the United States – from December 2019 through July 2022 – Waters sold his EPGC shares to over 20 investors for nearly $1.3 million in cash. The majority of these investors were based in the U.S.

41.     While residing in the United States, Waters targeted victims in the Montecito, California and Aspen, Colorado areas. Waters' wife, Helen Waters, befriended community members whom she believed were wealthy or well-connected -- often times the parents of their children's friends. Helen invited these prospective investors to dinner parties at the Waters' home. Waters typically solicited investments after the meals.

42.     In addition, Waters solicited investments in EPGC through telephone conversations, text messages, e-mail, and written offering presentations that Waters transmitted to investors (both in person and via e-mail).

43.     Waters told prospective investors that he was an experienced international businessman who had "revamped" EPGC.

44.     In furtherance of his ongoing scheme, Waters made multiple and repeated attempts to solicit additional EPGC share purchases from certain of these investors and invited them to sell their shares via a purportedly imminent Regulation A offering (which, to date, has not occurred).

**Water's False Statements to Investors**:

45.     Waters made several material misrepresentations and material omissions as he was marketing EPGC shares to investors and prospective investors from December 2019 through 2022. These material false statements and misleading statements fell into four main categories:

46.   <u>First</u>, Waters falsely represented to prospective investors that EPGC was well-positioned to capitalize on a new partnership with a retail affiliate of a well-known fashion magazine because EPGC held two valuable assets (a) purported Chinese trading licenses and (b) a purported large database of "verified high-end consumers."

47.   <u>Second</u>, Waters falsely represented to prospective investors that EPGC already had earned (and would continue to earn) significant, recurring revenues.

48.   <u>Third</u>, Waters misled investors by promising that they could turn a quick profit by buying his EPGC shares at a special low price and then quickly selling the shares following an "imminent" Regulation A offering. Waters represented that – after the Regulation A offering – EPGC shares would be worth three to four times what the investors had paid for them. Waters explained that the "opportunity" was being extended to his friends because regulations required Waters to bring his personal shareholding in EPGC below 50%.

49.   <u>Fourth</u>, Waters misled investors into believing their funds would be used to support EPGC's business, even though Waters was in fact selling his own EPGC shares. As set forth below, all of Waters' claims were false.

<u>Waters' Misrepresentations re ELLEShop China</u>:

50.   Between December 2019 and 2022, Waters told prospective and current investors (including the CBP Ltd. investors) that EPGC had acquired ELLEShop China, which he represented as being affiliated with the Hearst Corporation ("Hearst") (the owner and publisher of the well-known fashion magazine, ELLE).

51.   Those representations were false when made. In reality, in January 2020, EPGC had negotiated an explicitly non-binding term sheet (the "Term Sheet") with the shareholders of ELLEShop (a Chinese entity that had licensed the "ELLE" brand name from a subsidiary of Hearst). The Term Sheet outlined terms under which EPGC could acquire a majority stake in ELLEShop via a $5 million investment.

52.     Neither EPGC nor ELLEShop satisfied the necessary conditions for the acquisition of a majority stake to actually take place under the Term Sheet.

53.     For example, EPGC never made (and had no ability to make) the $5 million investment required for EPGC to acquire a majority stake in ELLEShop.

54.     In addition, among other conditions of the investment, ELLEShop was required to (i) sign a new licensing agreement with Hearst for use of the "ELLE" brand name (the current license was due to expire); and (ii) pay in full all outstanding licensing fees (which were in arrears). Neither condition was met.

55.     Several months later, in August 2020, Hearst, which held a minority stake in ELLEShop via a subsidiary, notified Waters that Hearst would not engage in further discussions with EPGC regarding ELLEShop, noting that Waters' litigation history made him an "unacceptable joint venture partner for Hearst."

56.     After receiving these communications from Hearst, Waters knew that (a) the "ELLE" brand name license would not be renewed, and (b) EPGC would seek to cancel and restructure the deal in a way that would not involve the "ELLE" name.

57.     EPGC never acquired a majority interest in ELLEShop, and – as of August 2020 – Waters knew that Hearst would not let EPGC or him use the "ELLE" brand name.

58.     The ELLEShop license agreement was formally terminated in November 2020 and was not renewed. In March 2021, Waters and a representative of ELLEShop's majority shareholder signed an agreement formally cancelling the January 2020 Term Sheet.

59.     Nonetheless, through at least early 2022, Waters continued to invoke the "ELLE" name and to make false statements about the status of the contemplated deal.

60.     For example, in oral communications and in written presentations that Waters distributed to prospective investors (some of which Waters distributed via email), Waters referred to ELLEShop as an EPGC "owned" channel and an existing EPGC partner.

61.     Similarly, in a February 2022 conversation with an EPGC investor whom Waters had invited to sell shares via the purported Regulation A offering, Waters claimed EPGC had purchased a majority interest in a platform related to ELLE magazine.

62.     In sum, Waters continued to use the ELLE name to entice investors, long after he had been told – in no uncertain terms – he had no right to use it.

Waters' Misrepresentations and Misleading Statements Related to EPGC's Supposed Chinese Trading Licenses:

63.     In oral communications and written presentations that Waters distributed (including via email) through at least December 2021, Waters described EPGC's free zone trading licenses – which allegedly allowed EPGC to offer partners an approximate 20% savings on Chinese import taxes – as extremely difficult to obtain and a significant competitive advantage for EPGC. Waters made similar representations to the CBP Ltd. investors.

64.     Waters claimed that EPGC's licenses were so valuable that the United States' largest internet retailer sought to use them.

65.     Waters-owned entities sold these licenses to EPGC for over 45 million EPGC shares.

66.     In reality, the purported trading licenses touted by Waters never earned any revenue and – if they even existed – were functionally worthless.

67.     EPGC wrote off the entire book value of these licenses (over $9 million) as of December 2020, because no future benefit was expected.

Waters' False Statements About EPGC's Consumer Database:

68.     Waters represented to investors that another of EPGC's valuable assets was its "proprietary database" of "high-end consumers."

69.     Waters claimed, in oral communications and written presentations that Waters distributed to prospective investors (some of which were distributed via

email), that EPGC's database of over 12 million consumers was proprietary and "verified."

70.    In reality, EPGC had a compilation of raw data about consumers in an Excel file, which had been compiled sometime prior to 2017.

71.    Because EPGC had not secured the necessary authorization from the email address owners to use their email addresses for marketing purposes, two EPGC Board members told Waters that he could not accurately claim the email lists had been "verified" (yet he continued to do so).

72.    Waters repeatedly represented to a third-party business partner ("Partner A"), that EPGC had a highly valuable, verified, "proprietary database" of 6 million "high-end" consumers (and 12 million total consumers) – i.e., the same database that Waters had touted to investors. Waters proposed to market Partner A's direct sale of products to consumers using EPGC's "proprietary database." This purported verified, "proprietary database" was the primary reason Partner A sought to do business with EPGC.

73.    But, Waters never provided that list to Partner A. Instead, he provided a list of several hundred thousand email addresses that he had recently bought from a different third-party vendor and that produced high error rates. Partner A continued to request the promised list of "high end consumers," but Waters never complied, and suggested that Partner A use their own customer list (even though EPGC's purported ability to market products through its massive consumer database was the reason behind the partnership). When the list never materialized, and Partner A's sales predictably failed to emerge, the partnership ultimately dissolved.

74.    In sum, EPGC's "proprietary database" of consumers – if it ever existed – was not as extensive, or as valuable, as Waters had promised investors. The only lists EPGC ever provided were virtually worthless.

Waters' False Statements About EPGC's Purportedly Imminent Securities Offering:

75.     Starting in 2021, Waters began telling prospective investors that they could buy EPGC shares from him for $0.212/share and then quickly earn several multiples of that amount when EPGC participated in an imminent public offering under Regulation A priced at $0.75 to $1.00/share.

76.     Waters told prospective investors that he had already lined up broker-dealers and buyers for the offering, and Waters led investors to believe the offering was a "done deal" or at the "finish line."

77.     Waters claimed that before the offering could occur, one final detail had to be resolved: he had to sell some of his personal holdings of EPGC stock. Waters falsely told prospective investors that a requirement of the Regulation A process was that he was not permitted, as a foreign national, to own more than 50% of EPGC stock.

78.     According to Waters, this requirement presented a unique opportunity to prospective investors; Waters claimed that he could sell his stock to prospective investors at his original acquisition price of $0.212/share, even though the offering price range would be $0.75 to $1.00/share (*i.e.*, more than three to four times the acquisition price).

79.     Waters told prospective investors that because broker-dealers had already lined up buyers to purchase EPGC stock at those higher prices, investors essentially would be guaranteed to profit from the deal (with a purported 300% - 400% profit as described above).

80.     Waters also offered to certain existing EPGC shareholders the "opportunity" to sell shares via the purported Regulation A offering. Waters told investors that EPGC would raise $10 million as part of this offering, and that EPGC would include up to an additional $3 million in existing investor shares in the offering (resulting in a total offering of $13 million).

81.     Specifically, Waters told investors they could elect to include shares valued at the offering price up to the amount of their initial investment in the Regulation A offering, and then hold on to their remaining shares or sell them on the open market at the new market price after the offering.

82.     For example, Waters told an individual who invested $25,000 at $0.212/share (*i.e.*, she purchased 117,924 EPGC shares), that she could include 33,333 of those shares in the Regulation A offering at $0.75/share and recoup her entire investment (*i.e.*, $25,000), which would leave her with 84,591 remaining shares trading at or near the Regulation A offering price of $0.75. Waters told the investor that she could either hold on to those remaining shares if she felt that the price would increase in the future, or she could sell those shares on the open market for an immediate profit of $63,443.

83.     The investor found this opportunity so compelling that she pulled money out of her retirement funds (requiring her to pay a tax penalty) in order to make the investment.

84.     Despite his promises of an imminent Regulation A offering by EPGC, Waters continually pushed back the date on which the offering would occur.

85.     In late 2021, Waters promised multiple investors (including a prospective investor who ultimately invested $548,000) that the Regulation A offering documents would be filed in the first quarter of 2022.

86.     Before a broker-dealer can participate in a distribution in a Regulation A offering, the broker must obtain a "No Objections Letter" from FINRA. In February 2022, in a conversation with an investor, Waters falsely stated that EPGC's broker-dealer already had submitted a request to FINRA for a No Objections Letter and that, by the end of March 2022, the Regulation A offering would occur and the investor would get his money back. In reality, FINRA never received a request that it issue a No Objections Letter in connection with the purported Regulation A offering by EPGC.

87.   In June 2022, Waters sent a text to a different investor falsely stating "we just got our Audit signoff yesterday" and, as a result, the Regulation A filing was "good to go."

88.   In July 2022, Waters told another prospective investor that the Regulation A offering would happen later that same week.

89.   In October 2022, in a conversation with an existing investor who was considering selling her shares via the Regulation A offering, Waters falsely stated that the Regulation A paperwork had been filed with the SEC a few weeks prior.

90.   The nature of the offering and date on which an offering would occur was of particular interest to the investors, who had purchased restricted EPGC shares. If investors wanted to re-sell these shares, they would need to either: (i) satisfy the mandatory holding period and obtain an attorney letter conforming to the requirements of Securities Act Rule 144 [17 C.F.R. § 230.144]; or (ii) participate in a registered offering, such as a Regulation A offering.

91.   Waters' representations that he was required to sell his stock before a Regulation A offering could occur were false when made. Regulation A does not prevent foreign nationals from holding more than 50% of a company making a Regulation A offering. In short, Waters' represented basis for the purported investment "opportunity" – *i.e.*, Waters having to sell the shares at a discount to investors which would lead to outsize profits – was a lie.

92.   Waters' representations to investors about the purported Regulation A offering paperwork also were false. During November 2022 sworn testimony to the SEC, Waters admitted that the proposed Regulation A offering document was never submitted to the SEC nor was any related request submitted to FINRA.

93.   To date, neither the SEC nor FINRA have any record of an application related to a Regulation A offering by EPGC.

94.   Furthermore, there was no realistic prospect of EPGC undertaking a Regulation A offering within the time frame Waters presented to investors; Waters'

representations that the offering price would be in the range of $0.75-$1.00 were unfounded; and his claims that broker-dealers had lined up buyers for the stock were false.

95.    EPGC's outside counsel had told Waters that work on the Regulation A paperwork would not begin until the retainer amount had been paid and, from that point, the timeline for drafting the Regulation A paperwork would be three to four months at best.

96.    Waters did not complete the process of retaining counsel to draft the Regulation A paperwork until January 27, 2022, and initial work did not begin until early February 2022.

97.    Furthermore, while EPGC had entered into a retention agreement with an authorized broker-dealer, that broker-dealer was not able to complete its due diligence process because Waters failed to provide requested information.

98.    In addition, EPGC's broker-dealer had not identified any buyers who had agreed to purchase EPGC stock as part of a Regulation A offering (let alone buy the shares at the price Waters represented to investors).

99.    EPGC's outside counsel also told Waters that audited financial statements were a necessary part of the Regulation A process. Waters knew about – or recklessly and/or negligently disregarded – the audit timeline. At the beginning of the audit, auditors estimated that they would not be able to complete the audit until April 2022. Waters knew that the audit could not be completed until the auditor was paid, and Waters' own failure to pay delayed the audit completion. He finally paid the auditor in September 2022. The audit was finally completed in October 2022.

100.    In sum, at the time he told multiple investors that the Regulation A offering was "imminent," Waters knew, or recklessly and/or negligently disregarded that the offering could not be completed in the short-term because significant hurdles remained before it could be completed, and there were no buyers in place ready to buy the shares to deliver the profits he promised to investors.

16

Waters' Misrepresentations and Misleading Statements About EPGC's Revenues:

101.   Waters told investors – including an existing EPGC investor whom Waters was inviting to sell shares via the Regulation A offering – that EPGC earned a 10-20% licensing fee on $8 to $12 million in annual sales by its clients (*i.e.*, that EPGC earned $800,000 to $2.4 million in annual recurring revenue).

102.   Waters told at least one other prospective investor – who ultimately bought $548,000 in EPGC stock from Waters – that EPGC had $8 to $12 million in recurring sales.

103.   These statements were false when made. As reflected in its annual reports (which Waters certified), EPGC earned only negligible revenue for fiscal years 2019-2022 (and nowhere close to the amount of revenue Waters represented to investors):

| SOURCE | REPORTED REVENUE |
|---|---|
| 2019 Annual Report | $278,491 |
| 2020 Annual Report | $68,936 |
| 2021 Annual Report | $6,939 |
| 2022 Annual Report | $0 |

104.   These reported revenues are consistent with EPGC's representation to its auditors that EPGC "has not been operational for most of 2020 and 2021 due to the pandemic and restructuring."

105.   Nonetheless, in a February 2022 conversation with an existing EPGC investor, Waters falsely claimed that $8 million in sales revenue from China was not included in EPGC's 2021 financial reports because it would have been too difficult to get the figures in time. Waters assured the investor that such revenue existed and would recur on an annual basis.

Waters' False Statements About the Use of Investor Funds:

106.   In soliciting investments, Waters told at least some investors that the proceeds from their purchase of Waters' EPGC stock would benefit EPGC.

107.   The Sales and Purchase Agreements executed by investors stated that investors are contracting with FCP and CBP USA. However, Waters showed at least one investor a hand drawn organization chart which falsely portrayed "Co Brand" and "FCP" as EPGC subsidiaries.

108.   Similarly, in a phone conversation, Waters falsely told another investor that shares sold to the investor were "held in trust" for the benefit of EPGC, and the investor's funds in fact went to EPGC.

109.   These representations regarding the use of funds were false when made. In reality, Waters and Helen used funds received from sales of Waters' EPGC shares for personal expenditures.

110.   From July 2020 through July 2022, Waters and Helen received more than $1.3 million of investor funds via bank accounts (which they controlled) in the name of an FCP affiliate and CBP USA, more than $1 million of which they used for personal use.

111.   Waters and Helen paid some family expenses directly from these FCP and CBP USA accounts. At other times, they transferred funds to accounts in their own names, and then used them for family expenses.

112.   Among other expenses, between June 2018 and October 2022, Waters and Helen spent the following investor funds for personal expenses:

(a)   At least $94,113 in payments on at least two Land Rover Sport Utility Vehicles;

(b)   At least $378,470 in rent payments on luxury homes in and around Aspen, Colorado and Montecito, California;

(c)   An unknown amount for the acquisition of at least three horses for the Waters family; and

(d)     At least $29,516 for horse riding lessons and boarding in and around Aspen and Montecito.

113.    Waters and the entities he owns and controls contributed net $268,934 to EPGC (far less than the $1.3 million Waters and Helen received from Waters' EPGC share sales or the $2 million Waters-owned entities promised to give EPGC in return for EPGC shares).

**Waters' Lies to Investors Were Material**:

114.    The misrepresentations identified in ¶¶ 50-113 were – both individually and when considered together – material. The misrepresentations involved core aspects of the investment such as: (a) the existence and value of assets purportedly central to EPGC's business, (b) the timeframe for the Regulation A securities offering that would purportedly provide an immense, near-instant profit on investment, (c) the amount of revenue earned by the company, and (d) the use of investor funds.

115.    Reasonable investors making investment decisions would find it important – as part of the total mix of information available – that, in reality: (a) the purported term sheet between EPGC and ELLEShop was non-binding (and ultimately terminated); (b) the purported Chinese trading licenses and proprietary customer database were worthless; (c) the purported Regulation A securities offering was not imminent, had significant hurdles to overcome before it could happen, and did not have buyers at the ready to purchase investors' stock (let alone buy it at a 300%-400% profit to the investor); (d) EPGC's revenues were nowhere near what Waters had represented (and had declined to $0 by 2022); and (e) at least $1 million of investor funds had been used by Andrew and Helen Waters to pay personal expenses.

**Defendant Waters Acted With Scienter**:

116.    Defendant Waters acted with scienter. At the time he made the representations identified in ¶¶ 50-113 Waters knew – or recklessly and/or negligently disregarded – that in reality: (a) the purported term sheet between EPGC and ELLEShop was non-binding (and ultimately terminated); (b) the purported

19

Chinese trading licenses and proprietary customer database were worthless; (c) the purported Regulation A securities offering was not imminent, had significant hurdles to overcome before it could happen, and did not have buyers at the ready to purchase investors' stock (let alone buy it at a 300%-400% profit to the investor); (d) EPGC's revenues were nowhere near what Waters had represented (and had declined to $0 by 2022); and (e) at least $1 million of investor funds had been used by Andrew and Helen Waters to pay personal expenses.

117.    Also, as described at ¶¶ 106-113 Waters knew that he was diverting a significant portion of investor funds for personal use.

118.    Waters began serving as EPGC's Executive Chairman in 2016, and later served as its Director and CEO. Also, since 2017, Waters has been EPGC's majority shareholder and the sole individual with decision making authority over EPGC's operations.

**Helen Waters' Receipt of Investor Funds She Was Not Entitled To**:

119.    Relief Defendant Helen Waters directly benefitted from Waters' misappropriation of investor funds.

120.    From July 15, 2020 through July 21, 2022, over $1 million of investor funds were deposited into accounts jointly controlled by Waters and Helen Waters and for which they both had signatory authority.

121.    The funds identified in ¶ 106-113 were used by Waters and Helen Waters to pay family expenses, including the expenses identified in ¶ 112 above.

122.    In addition, in July 2020, at least one investor made at least three transfers (totaling at least $6,300) directly to Helen Waters' personal Venmo account. Those transfers were sent with notes explaining that they were payments for EPGC shares at a purchase price of $0.21.

123.    Helen Waters had no legitimate claim to the investor funds that she received into accounts that were jointly or individually held in her name.

**Waters Testifies to the SEC Under Subpoena and Then Flees the United States**:

124.   In October 2022, the SEC – pursuant to a formal order of investigation – subpoenaed Waters to provide on-the-record investigative testimony under oath. Waters appeared and provided testimony under oath on November 2, 2022.

125.   Shortly after being questioned by the SEC, Waters and Helen – after living in the United States for over four years – allowed their home lease to expire and fled the country. In his testimony to the SEC, Waters indicated that he planned to return to Australia and live for two weeks per month in Huntington, California.

126.   On information and belief, Waters and his wife currently reside in or around Banjar Badung in Bali and – despite the plans they outlined to the SEC – have not returned to the United States.

### COUNT ONE
**Violations of Section 10(b) of the Exchange Act,**
**and Exchange Act Rule 10b-5**

**(Against Defendant Waters)**

127.   Paragraphs 1 through 126 are realleged and incorporated by reference.

128.   As more fully described in paragraphs 1 through 126 above, Defendant Waters, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

129.   As described in more detail in paragraphs 1 through 126 above, Defendant Waters acted with scienter in that he knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent conduct identified above.

130.   By reason of the foregoing, Defendant Waters violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**COUNT TWO**
**For Violations of Section 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. § 77q(a)(1), 77q(a)(2) and 77q(a)(3)]**
**(Against Defendant Waters)**

131.   The Commission realleges and incorporates by reference paragraphs 1 through 126.

132.   Defendant Waters, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:  (a) employed devices, schemes and artifices to defraud; (b) obtained money and property by means of untrue statements of material fact and by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

133.   Defendant Waters acted knowingly, or with extreme recklessness, in engaging in the fraudulent conduct described above.

134.   Defendant Waters also acted negligently in engaging in the fraudulent conduct described above.

135.   By engaging in the conduct described above, Defendant Waters violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

**COUNT III**

**Relief Defendant Claim Against Relief Defendant Helen Waters**

136.   Paragraphs 1 through 126 are realleged and incorporated herein by reference.

137.   As a result of the conduct described in paragraphs 106-113 and 119-123 above, Relief Defendant Helen Waters received funds from EPGC investors as a result of the violations of the securities laws by Defendant Waters alleged in Counts I and II.

138.   Relief Defendant Helen Waters has no legitimate claim to the investor funds she received. Relief Defendant Helen Waters should be required to disgorge all ill-gotten gains which inured to her benefit under the equitable doctrines of disgorgement, unjust enrichment, and constructive trust.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the SEC respectfully requests that this Court:

### **I.**

Find that Defendant Waters committed the violations alleged herein.

### **II.**

Issue orders of permanent injunction restraining and enjoining Defendant Waters, his agents, servants, employees, attorneys, and all persons in active concert or participation with them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### **III.**

Pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)], order Defendant Waters and Relief Defendant Helen Waters to disgorge all ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest thereon.

### **IV.**

Order Defendant Waters to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendant Waters from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**VI.**

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Defendant Waters from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78*l*) or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VII.**

Pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and/or 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1), 78u(d)(5)], enter an order permanently enjoining Defendant Waters from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered transaction, provided, however, that such injunction shall not prevent Waters from purchasing or selling securities listed on a national securities exchange for his own personal account;

**VIII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as the Court may determine to be just and necessary.

## **JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable pursuant to the Federal Rules of Civil Procedure.

Dated:  August 18, 2023

/s/ Gary Y. Leung
Gary Y. Leung
Attorney for Plaintiff
Securities and Exchange Commission